| | |
|---|---|
| COASTAL COUNTIES WORKFORCE, INC., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) 1:17-cv-00417-JAW |
| | ) |
| PAUL R. LEPAGE, et al., | ) ) |
| Defendants. | ) |

## ORDER ON MOTION TO DISMISS AND

## MOTION FOR A PRELIMINARY INJUNCTION

A local workforce training organization claims the Maine Governor and the Commissioner of the Maine Department of Labor (MDOL) failed to make funds available to it in a manner and time frame that federal law requires. The local workforce organization, Coastal Counties Workforce, Inc. (CCWI), seeks declaratory and injunctive relief under the Workforce Innovation and Opportunity Act (WIOA, the Act) and 42 U.S.C. § 1983, against Governor Paul R. LePage and Commissioner John Butera (Defendants). The Defendants filed a motion to dismiss for failure to state a claim upon which relief may be granted, arguing that WIOA does not provide CCWI a private right of action.

The Court denies the Defendants' motion to dismiss because it concludes that WIOA does provide CCWI a right enforceable through § 1983: the right to the prompt pass through of federal funds through the state of Maine on a program year basis. The Court grants CCWI's motion for a preliminary injunction because it will likely

prevail on the merits, two of the other factors weigh in its favor, and the last, the public policy question, is in equipoise.

## I. BACKGROUND

### A. Procedural History

On October 24, 2017, CCWI filed a complaint and a motion for temporary restraining order (TRO). *Compl.* (ECF No. 1); *Pl.'s Mot. for a TRO* (ECF No. 3). Six days later, on October 30, 2017, the Court held a status conference with the parties. *Min. Entry for Telephone Conference* (ECF No. 7).

After the conference, the Court ordered the parties to confer and, if unable to resolve the lawsuit, to discuss scheduling further written submissions and discovery issues. *Order* (ECF No. 8). The Court indicated that if the parties could not agree on scheduling issues, the Court would issue a scheduling order. *Id.*

On November 9, 2017, the Court held a second telephone status conference. *Min. Entry for Telephone Conference* (ECF No. 12). The Defendants agreed to make certain funds available to CCWI for Program Year 2016 (PY16), but the parties did not fully resolve the lawsuit, with funds for Program Year 2017 (PY17) still contested. With some of the urgency removed, counsel for CCWI agreed to pursue a preliminary injunction, rather than a TRO. Accordingly, the Court dismissed CCWI's motion for a TRO without prejudice on the same day. *Order* (ECF No. 13). Counsel for the Defendants stated they intended to file a motion to dismiss. On November 13, 2017, the Court issued a scheduling order for the upcoming motions and a testimonial hearing. *Pre-Hr'g Scheduling Order* (ECF No. 14).

On November 17, 2017, CCWI filed a motion for a preliminary injunction. *Pl.'s Mot. for Prelim. Inj.* (ECF No. 16) (*Pl.'s Inj. Mot.*). On December 6, 2017, the Defendants filed their response in opposition to the motion for a preliminary injunction. *Defs. Paul R. Lepage and John Butera's Mem. of Law in Opp'n to Pl.'s Mot. for a Prelim. Inj.* (ECF No. 24) (*Defs.' Inj. Opp'n*). On December 14, 2017, CCWI filed its reply. *Pl.'s Reply Mem. of Law in Support of Mot. for Prelim. Inj.* (ECF No. 35) (*Pl.'s Inj. Reply*).

Also on November 17, 2017, the Defendants filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *Defs. Paul R. LePage and John Butera's Mot. to Dismiss* (ECF No. 17) (*Defs.' 12(b)(6) Mot.*). On November 29, 2017, CCWI filed its response in opposition to the Defendants' motion. *Pl.'s Opp'n to Defs.' Mot. to Dismiss* (ECF No. 20) (*Pl.'s 12(b)(6) Opp'n*). On December 4, 2017, the Defendants filed their reply. *Defs. Paul R. LePage and John Butera's Reply Mem. in Supp. of Mot. to Dismiss* (ECF No. 23) (*Defs.' 12(b)(6) Reply*).

On December 18, 2017, the Court held an evidentiary hearing and heard oral argument at the close of the hearing. *Min. Entry for Hr'g* (ECF No. 39).

### B.    Statutory Background: WIOA

Congress passed WIOA in 2014. Workforce Innovation and Opportunity Act, Pub. L. No. 113-128, 128 Stat. 1425 (2014). The purposes of WIOA include "increas[ing] . . . access to and opportunities for the employment, education, training, and support services" and the "alignment of workforce investment, education, and economic development systems in support of a comprehensive, accessible, and high-

quality workforce development system." 29 U.S.C. § 3101. The Act authorizes appropriations for fiscal years 2015 to 2020 and directs those funds to state and local workforce development efforts. *Id.* § 3181.

To receive the federal funds, the Act requires local areas and states to set up a series of boards to administer the program. A state's governor establishes a state workforce development board (SWDB), composed of the governor, a member of each chamber of the state legislature, business leaders, and officials from labor organizations. *Id.* § 3111(a)-(b). The state board assists the governor in developing a state plan, as well as in overseeing the workforce development system, and in identifying aspects in need of improvement. *Id.* § 3111(d). A governor must submit a state plan on a four-year basis to the Secretary of Labor for approval.[1] *Id.* § 3112(a), (c). A state plan must include details about the workforce development system, including how the federal funds will be used, the local areas designated in the state, and performance and accountability measures. *Id.* §§ 3112(b), 3141.

A governor must designate local areas to administer the education and training programs within a state based on considerations such as labor market factors, regional economic development, and the availability of resources. *Id.* § 3121(b). A governor and local chief elected officials, like county commissioners, must establish local workforce development boards. *Id.* § 3122(a), (c). Local boards must be composed of individuals from groups like local business leaders, officials from labor organizations, and members of economic and community development entities. *Id.* §

---

[1] The Unified State Plan must also be approved by the United States Secretary of Education. 20 C.F.R. § 676.135(d).

3122(b).  Each local board submits a comprehensive local plan to the governor for approval on a four-year basis.  *Id.* § 3123(a).  The local plan outlines how designated entities and providers within the local area will implement the workforce development programs and carry out training, and specifies performance and accountability measures.  *Id.* §§ 3123(b), 3141.

Once a governor approves the local plans, the Secretary approves the state plan, and Congress appropriates federal funds, the Secretary makes allotments to each state based on funding formulae specified in the statute.  *Id.* §§ 3162, 3172.  A governor may reserve certain percentages of the funds for statewide purposes but then must make allotments to each of the local areas based on statutory funding formulae.  *Id.* §§ 3163, 3173.  The funds "shall be available for obligation only on the basis of a program year" running from July 1 to the following June 30.  *Id.* § 3249(g).  Funds the states and local areas receive during one program year "may be expended during that program year and the succeeding program year."  *Id.*

The statute requires the "prompt allocation of funds" at each level of administration.  *Id.* § 3242.  All funds the Secretary allots to the states "shall be allotted within 45 days after the date of enactment of the Act appropriating the funds."  *Id.* § 3242(c).  The funds a governor is required to allot to the local area "shall be made available . . . for a local area not later than 30 days after the date the funds are made available" to the governor "or 7 days after the date the local plan for the area is approved, whichever is later."  *Id.* § 3242(e).

## C. The Facts[2]

### 1. The Parties and Maine's Workforce Training System

Paul R. LePage is the Governor of the state of Maine. *Compl.* ¶ 8. John Butera is the Commissioner of MDOL. *Id.* ¶ 9. CCWI is a Maine non-profit corporation with a principal place of business in Brunswick, Maine. *Id.* ¶ 7.

There are three Local Workforce Investment Areas in Maine, each with its own Local Workforce Development Board. *Id.* ¶ 14; *Stipulation of Facts* ¶¶ 9-11 (ECF No. 32) (*Stipulations*). The local areas consist of the Coastal Counties Region (York, Cumberland, Sagadahoc, Lincoln, Waldo, and Knox Counties); the Northeastern Region (Aroostook, Piscataquis, Penobscot, Hancock, and Washington Counties); and the Central/Western Region (Somerset, Franklin, Oxford, Androscoggin, and Kennebec Counties). *Compl.* ¶ 15; *Stipulations* ¶¶ 9-11. Under the current system, the local boards and the local chief elected officials delegate the administration and oversight of WIOA funds to an entity created for that purpose for each of the three local areas (the workforce groups). *Compl.* ¶ 22; *Stipulations* ¶¶ 12-13. The

---

[2] In considering a motion to dismiss, a court is required to "accept as true all the factual allegations in the complaint and construe all reasonable inferences in favor of the plaintiff []." *Sanchez v. Pereira-Castillo,* 590 F.3d 31, 41 (1st Cir. 2009) (quoting *Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.,* 267 F.3d 30, 33 (1st Cir. 2001)). For purposes of the Motion to Dismiss, the Court only considers CCWI's factual allegations, which are those statements supported by a citation to the Complaint. Occasionally CCWI's factual allegations slip into the rhetorical. In accordance with Rule 12(b)(6), the Court has accepted the allegations in the Complaint, but it has sometimes noted that the statement is as alleged by CCWI, signaling that the Court is aware of the difference between alleging a demonstrable fact and asserting a policy viewpoint.

For purposes of the motion for a preliminary injunction, the Court considers the evidence the parties presented, including declarations, testimony at the hearing, and exhibits. Unless otherwise noted, the Court finds the statements in this section that are only supported by a citation to the Complaint were supported by other documentary evidence or testimony at the hearing.

workforce groups are largely or entirely funded by money Congress allocated under WIOA. *Compl.* ¶ 23.

CCWI is the entity the local board and the chief elected officials created to oversee the use of WIOA funds for the Coastal Counties Region. *Compl.* ¶ 27; *Stipulations* ¶ 13. CCWI uses the allocation of approximately $3 million each year to fund programs designed to help dislocated workers, low income adults, and young adults with barriers to employment throughout the Coastal Counties Region. *Compl.* ¶ 28.

By letter dated June 6, 2016, the former Commissioner of MDOL, writing as the designee for Governor LePage, confirmed that CCWI had been granted local area designation for the Coastal Counties Region. *Compl.* ¶ 29. By letter dated September 12, 2016, the former Commissioner of the MDOL granted conditional approval of the Coastal Counties Workforce Board's 2016-2020 local plan. *Id.* ¶ 30; *Stipulations* ¶ 16. This conditional approval remains in effect today. *Id.* CCWI has satisfied the conditions MDOL imposed. *Id.* USDOL approved Maine's State Plan on October 20, 2016. *Stipulations* ¶ 4.

Part of the process for making WIOA funds available to the local workforce groups is the execution of an agreement for each program year between the state of Maine and each local workforce group. *Compl.* ¶ 31. For all previous years in which MDOL distributed WIOA funds, the local workforce group agreements covered the entire program year. *Id.* ¶ 32. The local workforce groups say they require agreements for full program years in order to effectively plan and operate their

programs. *Id.* ¶ 34. As a general practice, WIOA funds are expended on a FIFO (first in, first out) accounting basis, as to particular types of expenditures. *Stipulations* ¶33. Before expending PY17 WIOA funds, CCWI's service provider must expend its PY16 funds; similarly before expending its PY17 WIOA administrative funds, CCWI must expend its PY16 administrative funds. *Id.*

## 2. Defendants' Dissatisfaction with the Current Administration of the Workforce Development System

Governor LePage has repeatedly sought to eliminate the local areas and local boards in favor of a single state-wide system. *Id.* ¶ 17. In November, 2012, the Secretary of the United States Department of Labor (USDOL) rejected Governor LePage's plan to re-designate the local areas to more closely match Maine's Chamber of Commerce regions, under WIOA's predecessor statute, WIA. *Pl.'s Ex.* 1. In a letter dated July 11, 2017, Governor LePage wrote to Secretary Acosta, requesting that Maine be granted "single State local area designation." *Id.* ¶ 18; *Joint Ex.* 1. This was at least the second time the Governor had made a similar request. *Compl.* ¶ 19. By letter sent on August 30, 2017, the Secretary rejected the Governor's request because it was not permissible under WIOA. *Id.* ¶ 20; *Joint Ex.* 2. In September, 2017, the Governor sought to remove the State from the funding process in order to have the federal agency fund the local areas directly. *Pl.'s Ex.* 3-4.

## 3. The Conflict over Program Year 2016 and 2017 Funds

For PY16, the Secretary made $9,372,636 in WIOA funds available to Governor LePage. *Compl.* ¶ 35; *Notice Regarding PY 2016 WIOA Allotments*, 81 Fed. Reg. 22640 (April 18, 2016). The PY16 funds were made available to Governor LePage in

June 2016. *Id.* ¶ 36. On July 7, 2016 the state of Maine entered into a contract with CCWI for CCWI's full share of the PY16 WIOA funds. *Id.* ¶ 37; *Joint Ex.* 10; *Stipulations* ¶ 18.

For PY17, the Secretary made $8,393,050 in WIOA funds available to Governor LePage. *Compl.* ¶ 38; *Notice Regarding PY 2017 WIOA Allotments*, 825 Fed. Reg. 27529 (June 15, 2017). The Secretary made the PY17 funds available to Governor LePage in a series of awards on June 22, 2017, July 14, 2017, and October 24, 2017. *Compl.* ¶ 39; *Stipulations* ¶¶ 19-21.

On July 7, 2017, MDOL offered CCWI a partial-year agreement for some of the PY17 funds. *Compl.* ¶ 43; *Defs.' Ex.* 1 ¶ 9-10; *Defs.' Ex.* 14 at 2. On August 2, 2017, CCWI sent a letter to Commissioner Butera to "formally complain/grieve" a violation of WIOA because MDOL had not yet made a portion of the PY17 funds available on a full program year basis. *Defs.' Ex.* 11. On August 15, 2017, MDOL found no contractual violation because it believed partial year contracts were permissible under WIOA, based on guidance from a USDOL grant officer. *Defs.' Ex.* 12. On September 20, 2017, CCWI wrote to the Secretary in order to "complain/grieve" MDOL's decision. *Defs.' Ex.* 13.

On September 7, 2017, Governor LePage wrote to the Secretary and stated that "Maine is no longer participating in the WIOA Title 1B program. We ask that no more of these funds be sent to the Maine Department of Labor." *Id.* ¶ 44; *Joint Ex.* 3. On September 20, 2017, Secretary Acosta responded that he "hope[d] to continue to work with" Governor LePage and suggested "two vehicles" for the Governor to

consider, redesignation of the local areas within the State and seeking congressional action to modify WIOA. *Joint Ex.* 4.

By letter dated October 23, 2017, MDOL purported to terminate CCWI's contract for the remaining PY16 funds. *Compl.* ¶ 41; *Joint Ex.* 5. That letter indicated that MDOL would only reimburse costs CCWI incurred until November 30, 2017. *Id.* Three days later, on October 26, 2017, shortly after CCWI filed this lawsuit, the Defendants rescinded the October 23, 2017 letter and agreed to make the PY16 WIOA funds available to the local workforce groups as before. *Joint Ex.* 6-7.

Governor LePage, either personally in his official capacity, or through his designees, including Commissioner Butera, has refused or otherwise failed to make the PY17 WIOA funds available in their entirety to the three local workforce groups. *Compl.* ¶ 42. The Defendants have refused to issue contracts with the local workforce groups for all of PY17. *Id.* ¶ 43. Instead, on November 1, 2017, MDOL offered to enter into a funding agreement with the local areas, conditioned upon submitting a budget that complied with a new sixty-percent training spending requirement. *Stipulations* ¶ 26; *Joint Ex.* 8.

A prior State Plan contained a similar forty-percent training requirement, but the current State Plan rescinded that policy, and the sixty-percent requirement is not in the current State Plan. *Stipulations* ¶¶ 29-30. On December 1, 2017, the State Board met, considered the sixty-percent requirement at the Governor's request, and rejected the policy. *Stipulations* ¶ 31.

Governor LePage directed and approved of all actions taken by state officials with regards to: (1) the PY16 and PY17 funds allocated to the local boards, including CCWI; (2) all efforts to change Maine's participation in WIOA; (3) all efforts to change the administrative structure of the WIOA program in Maine; and (4) all efforts to impose a sixty-percent minimum training expenditure requirement on the local boards. *Stipulations* ¶ 25. Commissioner Butera, with authority from the Governor, directed and approved of all actions taken by state officials with regard to the issuance of partial year award agreements for PY17. *Id.*

### 4. The Impact of the Funding Conflict

Since July 1, 2017, CCWI has continued to submit expenses and draw down 2016 funds. *Stipulations* ¶ 22. On October 26, 2017, approximately $731,153.56 remained of the PY16 funds allocated to CCWI. *Id.* As of November 30, 2017, $583,715.28 remained available to CCWI from PY16 funds. *Stipulations* ¶ 23. Since it filed this lawsuit on October 24, 2017, CCWI has drawn down funds in the amount of $218,880 from PY16 funds. *Stipulations* ¶ 24.

The PY16 WIOA funds are keeping CCWI's doors open and allowing it to offer limited services to workers and businesses through this first half of PY17. *Id.* ¶ 54. If the PY17 WIOA funds are not promptly made available, CCWI will be forced to cease all workforce training operations under WIOA by the end of January 2018, and CCWI's other independent funding will run out later in the year, forcing it to shut down completely by the end of June 2018. *Id.* ¶ 55; see also *Pl.'s Inj. Mot.* at 6 (ECF No. 16). WIOA funds represent seventy-five-percent of CCWI's budget for the PY17 period. *Compl.* ¶ 55. The remaining twenty-five-percent comes from stand-alone

grants which support programs that rely on the infrastructure funded by WIOA funds. *Id.*

Last year, CCWI received 49,213 customer visits through the local CareerCenters and affiliate offices. *Id.* ¶ 47. Of those visits, 16,512 customers required additional workforce services. *Id.* ¶ 48. In PY16, CCWI assisted 564 workers in obtaining employment at an average annual wage of $29,456, adding approximately $16.7 million to the state's economy. *Id.* ¶ 49. There are currently approximately 908 adult, youth, and dislocated workers enrolled in workforce intensive services or training. *Id.* ¶ 50. A majority of these visits and services will be adversely affected or completely eliminated if the local workforce groups lose funding. *Id.* ¶¶ 46, 51. Approximately 500 Maine employers will be adversely affected by not being able to obtain trained workers or receive business services. *Id.* ¶ 52. Other grants involving non-WIOA funds that are administered by CCWI for the benefit of Maine businesses and employers will be terminated should CCWI cease operating. *Id.* ¶ 53.

CCWI has already begun curtailing the services it is funding for workers and employers. *Id.* ¶ 56. Service providers for CCWI and the other local workforce groups are beginning to lay off employees. *Id.* ¶ 57. If forced to shut down its operations, CCWI anticipates that its personnel will seek other job opportunities, it will lose its other grants, and that it will be difficult, if not impossible, to resume operations even if the funds are made available at a later date. *Id.* ¶ 58. CCWI anticipates the withholding of the funds to directly result in approximately thirty workforce system

jobs lost in the Coastal Counties Region and seventy-five jobs statewide. *Id.* ¶ 59.

CCWI alleges this will cause individual harm to those workers, and a greater harm

though the effect on the workforce training system. *Id.* Once shut down, CCWI

alleges the workforce training system will be very difficult and expensive to rebuild.

*Id.*

CCWI alleges that the Defendants' attempt to reject Title I funds from WIOA

could adversely affect the ability of the State's workforce system to administer the

other federal programs, like Adult Education (Title II), Employment Services (Title

III), and Vocational Rehabilitation (Title IV). *Id.* ¶ 60. CCWI claims that this could

in turn place the state of Maine out of compliance with the mandates set forth by

USDOL and WIOA, and that the loss of Title 1 funding under WIOA will also cause

harm to the financial sustainability of multi-agency career centers, and other multi-

program service delivery sites that depend on it to contribute to fixed operating

expenses. *Id.* ¶¶ 60-61.

## II.   LEGAL STANDARDS

### A.   Motion to Dismiss

Rule 12(b)(6) requires dismissal of a complaint that "fail[s] to state a claim

upon which relief can be granted." FED. R. CIV. P. 12(b)(6). Under the general

pleading standards, a complaint must contain "a short and plain statement of the

claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). In

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009), the United States Supreme Court elaborated

on this pleading standard in the context of a motion to dismiss: "To survive a motion

to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

The First Circuit explained that "[t]he plausibility inquiry necessitates a two-step pavane." *García–Catalán v. United States*, 734 F.3d 100, 103 (1st Cir. 2013) (citing *Rodríguez–Reyes v. Molina–Rodríguez*, 711 F.3d 49, 53 (1st Cir. 2013)). "First, the court must distinguish 'the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'" *Id.* (quoting *Morales–Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012)). "Second, the court must determine whether the factual allegations are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678)).

### B.    Motion for a Preliminary Injunction

"A preliminary injunction is an extraordinary and drastic remedy that is never awarded as of right." *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8-9 (1st Cir. 2012); *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011); *accord Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). When deciding whether to grant a motion for preliminary injunction, the Court must carefully weigh four factors:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant]; (3) the balance of the relevant impositions, i.e., the hardship to the nonmovant if enjoined as

contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

*Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 17-18 (1st Cir. 2006) (quoting

*Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 11 (1st Cir. 2004)).

"The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor." *Id.* at 18. However, "[t]he sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm. Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002); *see Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 7 (1st Cir. 2012) (confirming that this factor is the "most important part of the preliminary injunction assessment") (citation omitted). Ultimately, "trial courts have wide discretion in making judgments regarding the appropriateness of [preliminary injunctive] relief." *Francisco Sánchez v. Esso Standard Oil Co.*, 572 F.3d 1, 14 (1st Cir. 2009).

## III.    THE PARTIES' POSITIONS

### A.    Likelihood of Success on the Merits

CCWI argues that it is likely to prevail on the merits because the Defendants are depriving it "of a right secured by the 'laws' of the United States" that is enforceable under § 1983. *Pl.'s Inj. Mot.* at 8-10. The Defendants respond that CCWI is unlikely to prevail on the merits because WIOA does not confer a "right" on CCWI that is enforceable under § 1983. *Defs.' Inj. Mot.* at 10-15. The Defendants also respond that, if CCWI has a right under the statute, they have not violated that right

because they made offers and CCWI refused to execute an agreement. *Id.* at 15-17. CCWI replies that the Defendants have violated their right because the State may not impose unilateral requirements on WIOA funds. *Pl.'s Inj. Reply* at 1-7.

The parties' arguments on the first prong of the preliminary injunction analysis are inextricably bound up in the question of whether CCWI has a right of action against the Governor and the Commissioner, which implicates the arguments the parties have made in their memoranda regarding the motion to dismiss.

### 1. Governor LePage and Commissioner Butera's 12(b)(6) Motion

The Defendants argue that CCWI fails to state a claim because their lawsuit is based on the erroneous assumption that WIOA creates a federal right enforceable through 42 U.S.C. § 1983. *Defs.' 12(b)(6) Mot.* at 2. The Defendants point out that when a plaintiff sues "under a federal statute that does not confer an express or implied cause of action, the lawsuit is properly dismissed for failure to state a claim" under Federal Rule of Civil Procedure 12(b)(6). *Id.* (citing, among others, *Arroyo-Torres v. Ponce Federal Bank, F.B.S.,* 918 F.2d 276, 280 (1st Cir. 1990)). The Defendants contend that all the most recent Supreme Court cases found the statute in question did not confer a right in similar circumstances. *Id.* at 6-8 (citing *Armstrong v. Exceptional Child Center, Inc.,* 135 S. Ct. 1378 (2015); *Gonzaga University v. Doe,* 536 U.S. 273 (2002); *Blessing v. Freestone,* 520 U.S. 329 (1997)).

The Defendants further assert that alternate enforcement mechanisms in WIOA indicate that Congress did not intend to create a private right enforceable through § 1983. *Id.* at 8, 10 (citing *Middlesex County Sewerage Authority v. National*

*Sea Clammers Ass'n*, 453 U.S. 1 (1981)). The Defendants insist that the funds are subject to "negotiation of a contract" which makes any entitlement CCWI might possess "vague and amorphous" and thus unenforceable. *Id.* at 11. The Defendants also maintain that the local workforce boards are not the intended beneficiaries of WIOA, and are at most "incidental beneficiaries." *Id.*

The Defendants next point to several cases decided under the predecessor statute to WIOA, the Workforce Investment Act, Pub. L. No. 105-220, 112 Stat. 936 (1998) (WIA). *Defs.' 12(b)(6) Mot.* at 8-9 (citing *Brown v. Rotenberg*, No.15-CV-6678 EAW, 2017 WL 3332241 (W.D.N.Y. August 3, 2017); *Machie v. Nguyen*, 824 F. Supp. 2d 146, 151 (D.D.C. 2011); *Municipality of San Juan, et al., v. Human Resources Occupational Development Council*, 371 F. Supp. 2d 52 (D.P.R. 2005)). The Defendants concede that a "limited number of cases allow[ed] a plaintiff to pursue a § 1983 claim under WIA," but the Defendants distinguish those cases on the basis that they "involved claims of political discrimination" in violation of provisions that are markedly different than the one CCWI asserts. *Id.* at 9 (citing *Caraballo Seda v. Javier Rivera*, 261 F. Supp. 2d 76 (D.P.R. 2003)).

The Defendants also argue that any claim that might have existed is now moot as to the PY16 funds, which were made available without restriction shortly after CCWI filed this lawsuit. *Id.* at 5.

### 2. CCWI's 12(b)(6) Opposition

CCWI recites the three factors to determine whether a statute creates a right enforceable under § 1983. *Pl.'s 12(b)(6) Opp'n* at 2-3 (citing *Colon-Marrero v. Velez*, 813 F.3d 1, 38 (1st Cir. 2016); *Blessing*, 520 U.S. at 340-41).

CCWI argues that the first factor, whether the provision was intended to benefit the plaintiff, weighs in favor of finding a right. *Id.* at 3-4. CCWI argues that 29 U.S.C. § 3242 uses language with an "*unmistakable focus* on the benefited class" when it said that funds shall be made available "for a local area." *Id.* (quoting *Gonzaga*, 536 U.S. at 284) (emphasis in original); also citing *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 468-469 (1990); *Wright v. Roanoke Redevelopment & Housing Authority*, 479 U.S. 418 (1987)). CCWI distinguishes cases where the Supreme Court did not find an individual right because in its view the provisions had an aggregate focus, suggesting they were "not concerned with whether the needs of any particular person have been satisfied." *Id.* at 3-5 (quoting *Gonzaga*, 536 U.S. at 288; also citing *Blessing*, 520 U.S. at 342-344; *Suter v. Artist M.*, 503 U.S. 347, 363 (1992)).

CCWI characterizes the cases under WIA, the predecessor statute to WIOA, as "inapt." *Id.* at 7. CCWI points out that WIA did not contain the provision at issue in this case, and that none of those cases addressed similar issues of funding pass-through requirements. *Id.* at 7-8. Instead, CCWI analogizes to a recent decision from another circuit finding an individual right. *Id.* at 8-9 (citing *D.O. v. Glisson*, 847 F.3d 374 (6th Cir. 2017)).

CCWI contends that the other factors used to determine whether a provision confers a right weigh in its favor. *Id.* at 9-10. CCWI claims the statute is not "so 'vague and amorphous' that its enforcement would strain judicial competence" because it only requires a court to decide a binary question, whether the funds have been made available or not. *Id.* at 9. CCWI also emphasizes that the provision uses mandatory rather than precatory terms, thereby imposing a binding obligation. *Id.* at 9-10.

CCWI explains that once a court finds a provision confers a right, that right is presumptively enforceable under § 1983 and this presumption is only overcome if Congress indicated an intent to foreclose that remedy. *Id.* at 10-11. CCWI maintains that WIOA does not contain any comprehensive alternate enforcement mechanism resembling the ones courts have found sufficient to displace the availability of § 1983 relief. *Id.* at 11-13.

CCWI argues its claim is not moot as to the PY16 funds because the "voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Id.* at 13-15 (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)).

Finally, CCWI insists that this case is not a contract dispute, where the parties have the power to make offers with conditions attached and decline to enter an agreement if they do not agree to those conditions. *Id.* at 15-18. CCWI emphasizes that, despite the use of the term "contract" and "sub-recipient award agreement," the state has no authority to create an offer with additional conditions or decline to enter

into an agreement. *Id.* at 16-18. CCWI claims "the State is responsible for ensuring that program funds are spent according to the requirements of WIOA, the State Plan, the Local Plan, and applicable federal grant accounting regulations" but has no further discretion in making funds available at the subaward stage. *Id.* at 17-18.

### 3. Governor LePage and Commissioner Butera's 12(b)(6) Reply

The Defendants argue that the intended beneficiaries of WIOA are the "individuals needing employment, education, training and support services," not the local workforce entities, and Congress denied the beneficiaries any right or entitlement to service. *Defs.' 12(b)(6) Reply* at 2-3.

The Defendants submit that the analytical framework set forth in earlier cases from the Supreme Court relied upon by CCWI have been "significantly undercut, if not implicitly overruled" by later cases. *Id.* at 4.

The Defendants suggest that finding an enforceable right would undermine principles of federalism. *Id.* at 5-6. The Defendants explain that Spending Clause legislation is like a contract between the Federal Government and the State, and the State "did not voluntarily and knowingly agree to a federally enforceable right." *Id.* at 6. They portray this case as involving "policy decisions that should be left to the political branches of State government." *Id.*

Finally, the Defendants urge that "WIOA expressly contemplates a process of negotiation and agreement involving the terms and conditions of WIOA programs within each region between the local board, the [chief elected official], and the Governor. *Id.* at 8-9 (citing 29 U.S.C. § 3141(c)(2)).

## B. Potential for Irreparable Harm to the Movant

CCWI argues that it will suffer immediate and irreparable harm if the Court does not promptly issue injunctive relief because it will be forced to stop operating, shut down its program, and terminate all employees by the end of June 2018, and its service provider will be forced to do so by the end of January 2018. *Pl.'s Inj. Mot.* at 10-11.

The Defendants respond that CCWI has not been denied any WIOA funds, and that it could avoid the alleged harm by accepting the contract the Defendants offered. *Defs.' Inj. Opp'n* at 18-20. The Defendants argue that the other regions' acceptance of the sixty-percent condition indicates CCWI will not suffer irreparable harm if it accepted the contract, because "operational disruptions and inefficiencies" are not sufficient to constitute irreparable harm. *Id.* (quoting *Experience Works, Inc. v. Chao*, 267 F. Supp. 2d 93, 97 (D.D.C. 2003)).

CCWI responds that going out of business constitutes irreparable harm. *Pl.'s Inj. Reply* at 7-8. CCWI argues that it is irrelevant that it could accept the Defendants' demands and mitigate the harm, because it need not submit to illegal conditions, and giving the state the authority that would upset the finely tuned mechanics of numerous federal funding statutes. *Id.*

## C. Balance of the Relevant Impositions

CCWI argues that there would be no harm to Governor LePage and Commissioner Butera if the Court directed them to cease blocking access to federal funds. *Pl.'s Inj. Mot.* at 11-12. In fact, CCWI argues, the injunction CCWI seeks

would benefit the Defendants by allowing federal funds to flow into the state and ceasing to imperil other related programs. *Id.*

The Defendants respond that an injunction would interfere with state's power to impose state-wide policy objectives under WIOA. *Defs.' Inj. Opp'n* at 20. The Defendants also assert that CCWI could have avoided any burden it faces by entering a contract, and the burden of doing so would have been minimal because the state could not have imposed any sanction for two years following CCWI's failure to meet the sixty-percent requirement. *Id.*

## D.    The Effect of the Ruling on the Public Interest

CCWI argues that there is a public interest "of the highest order" in having government officials follow the law. *Pl.'s Inj. Mot.* at 12 (quoting *Seattle Audubon Soc'y v. Evans*, 771 F. Supp. 1081, 1096 (W.D. Wash. 1991) (citing *Olmstead v. United States*, 277 U.S. 438, 485 (Brandeis, J., dissenting)). CCWI emphasizes the risks to the state workforce training system and the lost wages and economic benefits from any loss of access to the services the local areas provide with the funds. *Id.* at 12-13.

The Defendants respond that the injunction would frustrate the state-wide policy goal of increasing training spending and that frustrating the state wide policy objectives is against the public interest. *Defs.' Inj. Opp'n* at 20. The Defendants suggest that trainees currently enrolled in WIOA services could switch to alternate programs, like the State's Competitive Skills Scholarship Program (CSSP). *Id.* at 19.

CCWI replies that the there is no "State policy objective" consisting of a sixty-percent training requirement, because the State Board removed the prior forty-

percent requirement after finding it led to negative results. *Pl.'s Inj. Reply* at 9-10. CCWI also disputes whether the $3.8 million CSSP program could possibly substitute for the lost public benefits from $8 million in WIOA funding. *Id.* at 11.

## IV.    DISCUSSION

### A.    Likelihood of Success on the Merits

Many federal statutory rights are enforceable though § 1983. *DeCambre v. Brookline Hous. Auth.*, 826 F.3d 1, 10 (1st Cir. 2016) (citing *Maine v. Thiboutot*, 448 U.S. 1, 4–8 (1980)). But not all violations of federal law are enforceable through a § 1983 action. "[The] plaintiff must assert the violation of a federal *right*, not merely a violation of federal *law*." *Blessing*, 520 U.S. at 340 (emphasis in original). Courts must determine whether the statute "unambiguously confer[s] a right to support a cause of action . . . ." *Colón–Marrero v. Vélez*, 813 F.3d 1, 17 (1st Cir. 2016) (quoting *Gonzaga* 536 U.S. at 283). The First Circuit instructs that there are three factors that determine whether a specific statutory provision confers a right:

> First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.

*Colón–Marrero*, 813 F.3d at 17 (quoting *Blessing*, 520 U.S. at 340-41 (quoting *Wright* 479 U.S. at 431)). "If a plaintiff satisfies the threshold inquiry and demonstrates that Congress intended to confer an individual right, the right is presumptively enforceable by § 1983." *Id.* at 16. A defendant can rebut the presumption by showing that Congress either expressly "shut the door to private enforcement" in the text of

the statute creating the right, or impliedly, "by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Id.* (quoting *Blessing*, 520 U.S. at 341).

### 1. Does WIOA create a right for CCWI?

Section 3242(e) provides that "[f]unds shall be made available . . . for a local area not later than 30 days after the date the funds are made available to the Governor involved . . . or 7 days after the date the local plan for the area is approved, whichever is later." Section 3249(g) provides that "appropriations for any fiscal year for programs and activities funded under this subchapter shall be available for obligation on the basis of a program year" and that "[f]unds received by local areas from States . . . during a program year may be expended during that program year and the succeeding program year." The Court concludes that, under Supreme Court and First Circuit caselaw, § 3242(e) and § 3249(g) confer a right on the local areas to the prompt availability of funds on a full program year basis once the approvals of the State and Local Plans are in place and USDOL has allocated the funds to the Governor.

### a) Were § 3242(e) and § 3249(g) intended to benefit CCWI as "a local area"?

Under the first factor, a preliminary question is whether the provisions at issue were intended to benefit this class of plaintiffs. With some hesitancy, the Court ultimately concludes that Congress intended § 3242(e) and § 3249(g) to benefit a discrete class of beneficiaries, the designated local areas under state plans that receive the federal funds. The provisions confer a benefit "for a local area." The

provisions require prompt funding on a program year basis and specifies whom that benefit is "for."

The Court's hesitancy is first based on the absence of any prior caselaw on the precise issue before the Court. Although the parties analogized the provisions of WIOA to other laws and vigorously disputed each other's analogies, the parties cited no cases interpreting the WIOA provisions central to the dispute in this case. *Defs.' 12(b)(6) Mot.* at 8 ("[N]o reported decisions under WIOA address this precise issue"); *Pl.'s 12(b)(6) Opp'n* at 7 ("Defendants' suggestion that 'no court has allowed a local workforce board to bring a § 1983 action against a state under WIOA or its predecessor statutes based upon the type of WIOA violation asserted here' is misleading, as it suggests that courts have addressed the question"). This leaves the Court with a clean slate. Typically, where injunctive relief is sought, particularly as in this case against the head of the executive branch of state government, the federal court is not asked to blaze a new legal trail.

Next, CCWI proclaims that it can do what it acknowledges the ultimate beneficiaries of the WIOA cannot do, sue the Governor and Commissioner for WIOA funds. Section 3554(12) of title 29 reads: "Nothing in this subchapter shall be construed to provide an individual with an entitlement to a service under this subchapter." Under this language, if CCWI were without funds because the Governor withheld them, a dislocated worker who would benefit from WIOA funding to help secure "access to and opportunities for the employment, education, training, and support services," 29 U.S.C. § 3101, is statutorily barred from suing the Governor to

release the WIOA funds. Nevertheless, under CCWI's theory, even though its customers are not legally permitted to sue for federal funds, it may. This anomalous result gives the Court pause.

Analogizing the provisions of the WIOA to other statutes is imperfect because the structure of the Act and its specific provisions clash with the goals and language of other laws. Nevertheless, the Court looked for other cases where the ultimate beneficiaries of the statute differ from the entities directly affected by the law. Here, even though WIOA as a whole is focused on providing benefits to individuals in need of workforce training, not on the local entities overseeing that training, the text of the specific provisions at issue is focused on those entities that receive the funds from the federal government through the states. The Court looked for caselaw where the general principle is the same, even though the specifics differ.

The Court draws guidance from the First Circuit case of *Colón–Marrero*. In *Colón–Marrero,* a voter challenged the legality of Puerto Rico's removal of individuals from the active voter registry in violation of the Help America Vote Act. *Colón–Marrero*, 813 F.3d at 4. The First Circuit noted that the larger statutory section's "primary focus is the obligation of states to adopt measures to ensure accurate registration records," and not aimed at individual voter rights. *Id.* at 17. But the specific subsection at issue in *Colón–Marrero* "further[ed] that objective" of enhancing the accuracy of registration records "by directing state officials to implement certain safeguards for voter roll maintenance." *Id.* The First Circuit concluded this goal of

the specific provision, rather than other provisions or the statute as a whole, was intended to benefit the class of plaintiffs bringing the lawsuit. *Id.*

As with the Help America Vote Act, WIOA as a whole is intended to benefit individuals in need of workforce training, but § 3242(e) and § 3249(g) "further[ ] that objective by directing state officials" to confer a financial benefit to the local areas or their designated entities. In the words of the First Circuit, "Language that directs state officials in the implementation of statutory objectives may still create an enforceable right where it 'mentions a specific, discrete beneficiary group within the statutory text.'" *Colón–Marrero*, 813 F.3d at 17-18 (quoting *Rio Grande Cmty. Health Ctr. v. Rullan*, 397 F.3d 56, 74 (1st Cir. 2005)). Sections 3242(e) and 3249(g) specify a discrete class of beneficiaries – the local workforce areas – and they require states to hand over funds to those entities in a prompt manner on a full program year basis.

The Court's conclusion "is reinforced by the contrast drawn by the Supreme Court in *Gonzaga* . . . between the language quoted . . . from Titles VI and IX [of the Civil Rights Act] and the language of the Family Educational Rights and Privacy Act of 1974 ("FERPA") under review in that case." *Colón–Marrero*, 813 F.3d at 18-19. The *Gonzaga* Court pointed out that the FERPA provisions "speak only to the Secretary of Education, directing that '[n]o funds shall be made available' to any 'educational agency or institution' which has a prohibited 'policy or practice.'" *Id.* (quoting *Gonzaga*, 536 U.S. at 287). The *Gonzaga* Court noted that this focus on the federal agency's actions is "two steps removed" from the individual students who brought suit in that case. *Gonzaga*, 536 U.S. at 287. The Supreme Court contrasted

that federal agency focus in FERPA with individually focused language which does confer a right, like Titles VI and IX of the Civil Rights Act. *Id.* (quoting the Civil Rights language that "[n]o person . . . shall . . . be subjected to discrimination.").

The language in § 3242(e) and § 3249(g) is not directed solely at the federal agency. At most the provisions would be one step removed from the providers, if they were directed at the Governor. But § 3242(e) and § 3249(g) are not even directed solely at the Governor. The text simply requires that the funds "shall be made available" within the deadline and "shall be available for obligation only the basis of a program year" and thus "speaks to" entities that might block those funds, such as a governor, state agency, or federal agency. This suggests that Congress enacted § 3242(e) and § 3249(g) to confer individual benefits to the funding recipients and to restrict the ability of any relevant actor to interfere with that benefit after the Secretary approves the State Plan and the Governor approves the Local Plans and the Secretary allots the funds to the Governor. Viewed this way, this language confers a right on every local area not to have funds restricted beyond the thirty-day window or on a basis shorter than a program year. *See Colón–Marrero*, 813 F.3d at 18 ("On its face, [the provision] confers a 'right' on every 'registrant' not to be removed from a state's active registry for failure to participate in one general election").

The Court's conclusion is also supported by another line of caselaw. In *Blessing*, the Supreme Court declined to find an individual right when the statutory language required "substantial compliance" or created a "yardstick for the [federal agency] to measure . . . *systemwide* performance" rather than an "*individual*

entitlement to services." *Blessing*, 520 U.S. at 343-44 (emphases in original). The *Blessing* Court explained that if a statute only requires "substantial compliance" with the provision a plaintiff asserts, Congress must have anticipated some noncompliance, and thus did not intend to create a right. *Id.*

The Court examined § 3242(e) and § 3249(g), and their other subsections, for language indicating Congress contemplated any level of noncompliance with the prompt allocation of funds on a program year basis. The statutory language contains no flexible standard or yardstick. The statutory requirement is binary. The funds are either available for the local area within the timing window and until the end of the second program year, or they are not. This further bolsters the Court's conclusion that Congress intended the language in question to confer a benefit on the local areas.

One countervailing indication from the caselaw is the source of authority Congress used to enact WIOA. WIOA is Spending Clause legislation. The First Circuit and Supreme Court caution against lightly concluding that statutes enacted under Congress's spending power give rise to enforceable individual rights, as "the typical remedy for state noncompliance with federally imposed conditions [in spending legislation] is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State." *Colón–Marrero*, 813 F.3d at 19 (quoting *Gonzaga Univ.*, 536 U.S. at 280 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 28 (1981))).

Even so, the same analysis and tests apply to spending statutes as to any others. *See Rullan*, 397 F.3d at 72-75. In *Rullan*, the First Circuit concluded that

certain federally qualified healthcare providers did have a right of action under 42 U.S.C. § 1396a(bb)(5) of the Medicaid statute, despite the fact that Medicaid was enacted under Congress' spending power. *Id.*

*Rullan* is particularly instructive when coupled with another First Circuit case, *Long Term Care Pharmacy Alliance. v. Ferguson*, 362 F.3d 50 (1st Cir. 2004). Both cases asked whether a certain class of medical service providers had an enforceable right under a specific provision of the Medicaid statute. The *Ferguson* Court examined 42 U.S.C. § 1396a(a)(13)(A), which provided that the State plan shall provide:

> (A) for a public process for determination of rates of payment under the plan for hospital services, nursing facility services, and services of intermediate care facilities for the mentally retarded under which—
>> (i) proposed rates, the methodologies underlying the establishment of such rates, and justifications for the proposed rates are published,
>> (ii) providers, beneficiaries and their representatives, and other concerned State residents are given a reasonable opportunity for review and comment on the proposed rates, methodologies, and justifications,
>> (iii) final rates, the methodologies underlying the establishment of such rates, and justifications for such final rates are published . . . .

*Id.* at 56. *Rullan* examined 42 U.S.C. § 1396a(bb)(5), which provided that:

> **(A) In general**
> In the case of services furnished by a [Federally Qualified Healthcare Center] . . . pursuant to a contract between the center or clinic and a managed care entity . . ., the State plan shall provide for payment to the center or clinic by the State of a supplemental payment equal to the amount (if any) by which the amount determined under [the earlier paragraphs describing the payment system] of this subsection exceeds the amount of the payments provided under the contract.
> **(B) Payment schedule**
> The supplemental payment required under subparagraph (A) shall be made pursuant to a payment schedule agreed to by the State and the

[Federally Qualified Healthcare Center] . . . , but in no case less frequently than every 4 months.

*Rullan*, 397 F.3d at 74.

In *Ferguson*, the First Circuit concluded the medical service provider did not have an enforceable right under subsection (13)(A), but in *Rullan*, the First Circuit concluded the medical service provider had an enforceable right under subsection (bb)(5). *Id.* at 73-75. The *Rullan* Court explained that subsection (13)(A) "contained no 'rights-creating language,' identified no 'discrete class of beneficiaries,' focused on the state as a regulated entity rather than any individuals protected, and set out broad, general goals." *Id.* at 73. It concluded the opposite was true for subsection (bb)(5). *Id.*

The combination of *Ferguson* and *Rullan* counsels in favor of the local area's possessing an enforceable right under § 3242(e) and § 3249(g). WIOA, like the Medicaid statute, ultimately seeks to benefit the individual service seekers, rather than the service providers, but both statutes contain provisions that further that larger goal by conferring benefits on certain types of providers in some circumstances. CCWI's position is stronger than the plaintiff in *Rullan*. The provisions of WIOA at issue here confer a direct, mandatory funding benefit on CCWI as the designee of the Coastal Counties local area, whereas the provision of the Medicaid statute at issue in *Rullan* spoke to the requirements of the state plan, one step further removed from a mandatory requirement conferred on the service providers. Despite this focus on the state plan, the *Rullan* Court still found a right of action. *Id.* at 74 ("The mere fact that all the Medicaid laws are embedded within the requirements for a state plan

does not, by itself, make all of the Medicaid provisions into ones stating a mere institutional policy or practice rather than creating an individual right"). CCWI's right to the prompt allocation of funds on a program year basis only arises after the approval of a state plan, but it is not contained within the provisions governing administrative approval of state plans. It is an independent requirement.

Other provisions of WIOA confirm the viability of Spending Clause legislation to create individual rights as long as Congress uses the proper language. For example, another section in WIOA provides, "No individual shall be excluded from participation in, denied the benefits of, subjected to discrimination under, or denied employment in the administration of or in connection with, any such program or activity because of race, color, religion, sex . . ., national origin, age, disability, or political affiliation or belief." *Id.* § 3248(a)(2). This language is strikingly similar to the language in Title VI and IX of the Civil Rights Act, which the Supreme Court held is individually enforceable through § 1983. *See Alexander v. Sandoval*, 532 U.S. 275, 279 (2001) (discussing *Cannon v. University of Chicago*, 441 U.S. 677 (1979)). There is no indication from the Supreme Court or the First Circuit that the presence of the same language in a Spending Clause statute would not confer a right, when that same language does so in a statute enacted under the Commerce Clause. Some courts have concluded that similar language in WIA, WIOA's predecessor statute, conferred an enforceable individual right to be free from discrimination even though WIA was enacted under the Spending Clause. *See Caraballo Seda*, 261 F. Supp. 2d at 80-83.

In sum, the Court concludes § 3242(e) and § 3249(g) were intended to confer a benefit to the local areas.

### b) Is the asserted right so "vague and amorphous" that enforcement would strain judicial competence?

CCWI's asserted right to the prompt allocation of funds on a program year basis is neither vague nor amorphous. CCWI claims that once the state and local plans are approved and USDOL makes the state allocation, the funds must be made available to them within 30 days and for a period of two program years. As noted earlier, the requirement that § 3242(e) and § 3249(g) outlines is categorical and binary. The funds are available for the entirety of the correct time window, or they are not. Any judicial relief the Court might provide would be similarly straightforward.

The cases in which courts have found the asserted right too vague or difficult to enforce involved ambiguous or subjective statutory requirements like "reasonable efforts," *Suter v. Artist M.*, 503 U.S. 347, 360 (1992), and "sufficient" staffing levels. *Blessing*, 520 U.S. at 345. There is no similar problem with the right to the prompt allocation of funds on a program year basis that CCWI claims here.

### c) Is there a binding obligation, or is the language mandatory, rather than precatory?

Section 3242(e) and § 3249(g) contain mandatory terms. They impose a binding obligation that the funds "shall" be made available within the specified time frame and "shall be available for obligation only on the basis of a program year." Other provisions in WIOA use precatory or permissive language, which confers discretion on state and federal actors. *See e.g.* 29 U.S.C. § 3201 ("The Secretary may

require the operator . . .”); *id.* § 3163 (“the Governor may use the reserved amounts . . .”).  By contrast, § 3242(e) and § 3249(g) are mandatory and binding.

Subsection 3249(g)(2)(A) does contain permissive language.  *Id.* (“Funds obligated for any program year for a program or activity funded under subtitle B [29 U.S.C. §§ 3151 *et seq.*] *may* be expended by each State receiving such funds during that program year and the 2 succeeding program years.  Funds received by local areas from States under part B [29 U.S.C. §§ 3151 *et seq.*] during the program year *may* be expended during that program year and the succeeding program year”) (emphasis supplied).  It uses the term “may.”  But this language specifies what the local area “may” itself do.  Subsection (g)(2)(A) provides that the local areas are permitted to use the funds for two program years.  That is not precatory language providing what others “may” do as it regards the local areas.  This language still imposes a mandatory obligation, it is simply that the focus on the local area’s ability places that mandatory obligation on other actors not to interfere with the local areas’ ability.  If a state tries to prevent a local area from using the funds before the end of the second year, that violates the statutory instruction that the local area is permitted to do so.  The USDOL Grants Management Administrator reached the same conclusion.  *Pl.’s Ex.* 24 (“it would be impermissible for any contract to shorten the period of availability of funds to the local area from the period specified in [29 U.S.C. § 3249(g)(2)(A)]”).

Since all three factors weigh in favor of a right, the Court concludes § 3242(e) and § 3249(g) do confer a right to the prompt allocation of funds on a program year basis to the local areas.

## 2. Is the right to the prompt allocation of funds on a program year basis enforceable under § 1983?

Since CCWI has satisfied "the threshold inquiry and demonstrate[d] that Congress intended to confer an individual right, the right is presumptively enforceable by § 1983." *Colón–Marrero*, 813 F.3d at 17. "Congressional intent to 'shut the door to private enforcement' of a federal statute may be shown by means of language in the act itself specifically foreclosing a remedy under § 1983 or by implication from Congress's creation of 'a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983.'" *Id.* at 20 (quoting *Gonzaga*, 536 U.S. at 284 n.4). The Supreme Court and the First Circuit caution against "lightly conclud[ing] that Congress intended to preclude reliance on § 1983." *Id.* (quoting *Gonazaga*, 536 U.S. at 423-24 (quoting *Smith v. Robinson*, 468 U.S. 992, 1012 (1984))). The First Circuit instructs that "[a] plaintiff's ability to invoke § 1983 cannot be defeated simply by the availability of administrative mechanisms to protect the plaintiff's interests." *Id.* (quoting *Blessing*, 520 U.S. at 347 (quoting *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 106 (1989))) (internal quotation marks and modifications omitted). Rather, the "dividing line" for inferring Congressional intent to foreclose § 1983 enforcement is when "the statute itself" provides for "a private judicial remedy for the violation of federal rights" but makes that remedy "more restrictive" than that provided by §1983. *Id.* (citing *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 119–21 (2005)).

There is no express language in WIOA removing § 1983 enforcement of the local areas' right to the prompt allocation of funds on a program year basis. The only

question is whether Congress created an alternate enforcement scheme incompatible with individual enforcement. There are several enforcement mechanisms in the statute that apply to different actors. The Court proceeds in descending order through the remedies and enforcement mechanisms, starting with those available to the highest level actors and ending with the individual trainees.

First, USDOL has broad powers under the statute, including the power to approve or deny state plans every four years, and at the intermediate two-year mark if the state board and the governor submits modifications to the state plan. 29 U.S.C. § 3112(c). If the Secretary does not believe a state is complying with the requirements of WIOA, it can use its power to approve or reject the state plan. Any applicant for financial assistance dissatisfied with the decision of the Secretary to award or not award assistance or to implement a corrective action can challenge the decision in a hearing before an Administrative Law Judge (ALJ). *Id.* § 3246. The decision of the ALJ constitutes a final agency action unless the Secretary overturns that decision, and the final agency action is then subject to judicial review by a Court of Appeals. *Id.* §§ 3246-47.

Second, governors certify local boards for each local area every two years and can "decertify" a local board for fraud or abuse, or for failing to carry out their duties under the statute. *Id.* § 3122(c)(2)-(3). Governors also have the power to approve or reject local plans for consistency with the state plan on a four-year basis, and at the two-year midpoint if the local board submits modifications. *Id.* § 3123(a), (e).

Third, WIOA requires that each state use "fiscal control and fund accounting procedures as may be necessary to assure the proper disbursal of, and accounting for, Federal funds allocated to local areas" and maintain records "in accordance with generally accepted accounting principles applicable in each State." *Id.* § 3244(a). The statute also requires each state, governor, and local area receiving funds to "comply with the applicable uniform cost principles" and "uniform administrative requirements" included in federal circulars and rules. *Id.* § 3244(a)(2). Governors are tasked with monitoring the local areas to ensure compliance with these uniform administrative requirements. *Id.* § 3244(a)(4). Governors or the Secretary can impose a corrective action or sanctions in the event a local area does not comply with the financial controls. *Id.* §§ 3244(a)(5), (a)(7), (b). A local area can appeal any corrective actions by a governor to the Secretary. *Id.* § 3244(b)(2). Any funds recipients are liable to repay amounts they misspend if the misspending was due to willful disregard, gross negligence, or a pattern of misspending. *Id.* § 3244(e)-(f). In an emergency, the Secretary can give notice and an opportunity for a hearing and terminate financial assistance to a recipient of the funds. *Id.* 3244(e). All of these remedies under § 3244 "shall not be considered to be the exclusive remedies available" for these violations. *Id.* §3244(g).

Fourth, governors and local boards create criteria which determine which educational institutions and organizations are eligible to be service providers. *Id.* § 3151(a)-(g); *id.* § 3152(a), (b). They can then designate which individual providers receive funds, and can deny or terminate eligibility. *Id.* § 3151(d); *id.* § 3152(c), (f).

There must be an administrative process for service providers to appeal such determinations. *Id.* §3151(h)(2)(E); *id*. § 3152(c)(1).

Fifth and finally, WIOA contains specific requirements that apply to the individual training recipients. For example, trainees "shall be compensated at the same rates . . . as trainees or employees who are similarly situated." *Id.* § 3241(a). WIOA requires that "[e]ach state and local area . . . shall establish and maintain a procedure for grievances or complaints . . . from participants and other interested or affected parties" which includes an opportunity for a hearing. *Id.* § 3241(c). The Secretary must make a final determination within 120 days. *Id.* § 3241(c)(2)(B). The remedies from that process shall be limited:

> (A) to suspension or termination of payments under this subchapter;
> (B) to prohibition of placement of a participant with an employer that has violated any requirement under this subchapter;
> (C) where applicable, to reinstatement of an employee, payment of lost wages and benefits, and reestablishment of other relevant terms, conditions, and privileges of employment; and
> (D) where appropriate, to other equitable relief.

*Id.* § 3241(c)(3). But nothing in that paragraph limiting remedies under § 3241 "shall be construed to prohibit a grievant or complainant from pursuing a remedy authorized under another Federal, State, or local law for a violation of this subchapter." *Id.* § 3241(c)(4).

For another example, WIOA requires that participants have an expeditious appeal process if a state chooses to test participants for use of controlled substances. *Id.* § 3241(f). Similarly, WIOA prohibits discrimination against individual participants based on protected characteristics, and tasks the Secretary with either referring the matter to the Attorney General for a civil action, or taking "such other

action as may be provided by law." *Id.* § 3248(b)-(c); § 3244(f). The Secretary's discrimination enforcement mechanisms "shall not be considered to be the exclusive remedies available" for such violations. *Id.* § 3244(g).

None of these remedies contemplates the kind of dispute that forms the basis of this litigation over the "Prompt Allocation of Funds" requirement or the "program year basis" requirement of the statute. Section 3244(b)(2) provides the local areas with an administrative appeal mechanism to the Secretary, but that process only applies to corrective actions and sanctions by the Governor, not at issue here. Section 3241(c) requires States and local areas establish a grievance process for individual "participants and other interested or affected parties" for violations of wage and labor standard requirements, and the Secretary must respond within 120 days. But this grievance process is for participants, not the local areas, whom WIOA tasks with setting up this grievance process. Additionally, this process has limited remedies, not suited to a conflict between a local areas and a state over these provisions. The Defendants argue that the Court should not provide relief to CCWI because it sent a letter to USDOL and initiated the 120 day grievance process. But the Court cannot find, and the parties do not point to any provision creating an administrative grievance process for the benefit of the local areas, as opposed to the beneficiaries, based on violations of the right to the prompt allocation of funds on a program year basis.

In short, the statute provides no clear alternate remedy for violations of the right to the prompt allocation of funds on a program year basis. There are no

"unusually elaborate enforcement provisions" providing a "carefully tailored administrative and judicial mechanism" to enforce that right. *See Sea Clammers*, 453 U.S. at 101; *Robinson*, 468 U.S. at 1009. For the right to the prompt allocation of funds on a program year basis, WIOA does not "contain[ ] a remedial system that includes judicial review but 'limits relief in ways that § 1983 does not.'" *Colón–Marrero*, 813 F.3d at 21 (quoting *Rancho Palos Verdes*, 544 U.S. at 122, 125.

Accordingly, the Court concludes CCWI's right to the prompt allocation of funds on a program year basis is enforceable through § 1983 because Congress did not indicate an intent to foreclose that enforcement.

### 3. Have the Defendants violated CCWI's right to the prompt allocation of funds on a program year basis?

The Court has determined that the relevant WIOA provisions confer a right to the local areas, but it still must define the scope of that right and determine if CCWI is likely to be able to show that Defendants violated that right.

### a) PY16 Funds

In its October 24, 2017 Complaint, CCWI demanded that Governor LePage and Commissioner Butera release WIOA funds for both PY16 and PY17. *Compl.* at 11-12 ("**WHEREFORE,** Plaintiff [CCWI] respectfully request[s] that the Court: . . . E. Preliminarily and permanently enjoin Defendants Governor LePage and Commissioner Butera to immediately make the PY 16 WIOA Funds available to CCWI"). On November 1, 2017, however, Ed Upham, Director of the Bureau of Employment Services for MDOL, wrote to Michael Bourret, Executive Director of CCWI, and affirmed that the state would release the 2016 funds to CCWI. *Joint Ex.*

8, *Letter from Ed Upham Director BES, to Michael Bourret, Executive Director, CCWI*

(Nov. 1, 2017). Director Upham wrote:

> Please consider this letter as rescission of my letter dated October 23, 2017 where you were told that PY 2016 WIOA funds . . . would not be available after November 30, 2017 and PY 2017 WIOA contracts would not be amended to extend past October 31, 2017. As outlined in my letter of October 26, 2017, PY 2016 funds . . . will be available until your contract end dates of June 30, 2018.

*Id.* As the state of Maine rescinded its earlier refusal to restrict access to the PY16 funds, the question arises whether CCWI's lawsuit for PY16 WIOA funds is still viable.

Even though the state of Maine has made the PY16 funds available "without restriction," CCWI takes the position that the Court should still rule on its claim for PY16 funds because "there is no guarantee that Defendants will continue to make the PY16 WIOA Funds available to CCWI." *Pl.'s 12(b)(6) Opp'n* at 14. It maintains that the dispute is "capable of repetition and a preliminary and permanent injunction should be issued to ensure that Defendants do not withhold access to the funds in the future." *Id.*

CCWI is not willing to trust state government. It points out that although the Defendants withdrew their October 23, 2017 attempt to block access to the PY16 funds, "defendant[s'] voluntary cessation of allegedly unlawful conduct ordinarily does not suffice to moot a case." *See Laidlaw*, 528 U.S. at 174; *United States v. Oregon State Med. Soc.*, 343 U.S. 326, 333 (1952) ("When defendants are shown to have settled into a continuing practice . . . courts will not assume that it has been abandoned without clear proof. It is the duty of the courts to beware of efforts to

defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption") (internal citations omitted).

The Court is not as cynical about state government as CCWI. As the November 1, 2017 letter was written in the context of CCWI's lawsuit against the Governor and Commissioner, the Court views the letter as a promise to release the funds as demanded. "Article III of the Constitution confines the judicial power of federal courts to deciding actual 'Cases' or 'Controversies.'" *Hollinsworth v. Perry*, 133 S. Ct. 2652, 2661 (2013) (citing U.S. CONST. art. III, § 2); *see Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 535 (1st Cir. 1995). The Court does not see the need to order the Governor and the Commissioner to do what they—through a subordinate state official—promised to do.

CCWI worries that the Defendants' promise to release the PY16 funds is a ruse to avoid a judicial ruling in CCWI's favor. *Pl.'s 12(b)(6) Opp'n* at 15 ("Defendants' voluntary cessation of withholding the PY16 WIOA Funds from CCWI does not deprive this Court of its power to determine the legality of the practice because Defendants have failed to meet the 'heavy burden' of persuading this Court that they will not repeat these actions in the future"). But in this decision the Court is addressing the PY17 funds and is therefore issuing the very ruling CCWI claims the Defendants are seeking to avoid.

Given the state of Maine's promise to release the PY16 funds at issue in CCWI's Complaint, the Court does not view the Plaintiff's claim regarding the PY16

funds as necessitating injunctive relief.  The Court will dismiss without prejudice so much of Plaintiff's Complaint as concerns WIOA funds for PY16.  Of course, in light of the dismissal without prejudice, if the Court's faith in the state of Maine proves to have been misplaced, CCWI is free to reinitiate its claim for the PY16 funds.  The Court turns to the real controversy between the parties: WIOA funds for PY17.

### b)     PY17 Funds

As to the PY17 funds, the thirty-day time window from the date all the funds were made available to the Governor has elapsed.  Despite this, the Defendants argue that they have satisfied their legal obligations by offering to enter into a contract with CCWI provided that CCWI's budget complied with a new sixty-percent training requirement.  CCWI argues that offering to make the funds available only if CCWI meets a new condition is not truly making the funds available as the statute requires, because they argue the Defendants had no authority to impose the new sixty-percent condition at this stage.  Essentially, the parties offer two competing interpretations of the Governor's authority under WIOA at the stage when the statute instructs that the "funds shall be made available . . . within 30 days. . . ."

The parties do not agree on the nature of the legal instrument the state of Maine uses to make money available to the local areas.  Under Federal Office of Management and Budget (OMB) guidance and regulations, a "federal award" is the "Federal financial assistance that a non–Federal entity receives directly from a Federal awarding agency or indirectly from a pass-through entity" or the "cost-reimbursement contract under the Federal Acquisition Regulations that a non–Federal entity receives directly from a Federal awarding agency or indirectly from a

43

pass-through entity." 2 C.F.R. § 200.38. A "recipient" means "a non–Federal entity that receives a Federal award directly from a Federal awarding agency to carry out an activity under a Federal program." *Id.* § 200.86. A "subaward" means:

> an award provided by a pass-through entity to a subrecipient for the subrecipient to carry out part of a Federal award received by the pass-through entity. It does not include payments to a contractor or payments to an individual that is a beneficiary of a Federal program. A subaward may be provided through any form of legal agreement, including an agreement that the pass-through entity considers a contract.

*Id.* § 200.92. A "subrecipient" is "a non–Federal entity that receives a subaward from a pass-through entity to carry out part of a Federal program; but does not include an individual that is a beneficiary of such program." *Id.* § 200.93. A "pass-through entity" is "a non–Federal entity that provides a subaward to a subrecipient to carry out part of a Federal program." *Id.* § 200.74.

CCWI argues that it is a subrecipient of a subaward from the state, and the state is a recipient of the larger federal award, making the state a pass-through entity. The Defendants insist the state has offered a "contract" to CCWI, and as a result it can place conditions on that offer just as any offeror could in any typical contract setting.

On this issue, the Court concludes that CCWI has the better argument. For purposes of federal funding systems, a "contract" means:

> a legal instrument by which a non–Federal entity purchases property or services needed to carry out the project or program under a Federal award. The term as used in this part does not include a legal instrument, even if the non–Federal entity considers it a contract, when the substance of the transaction meets the definition of a Federal award or subaward . . .

*Id.* § 200.22. "A contract is for the purpose of obtaining goods and services for the non–Federal entity's own use and creates a procurement relationship with the contractor." In contrast to a contract, the regulations specify that:

> Characteristics which support the classification of the non–Federal entity as a subrecipient include when the non–Federal entity:
> (1) Determines who is eligible to receive what Federal assistance;
> (2) Has its performance measured in relation to whether objectives of a Federal program were met;
> (3) Has responsibility for programmatic decision making;
> (4) Is responsible for adherence to applicable Federal program requirements specified in the Federal award; and
> (5) In accordance with its agreement, uses the Federal funds to carry out a program for a public purpose specified in authorizing statute, as opposed to providing goods or services for the benefit of the pass-through entity.

*Id.* § 200.330(a). Perhaps most importantly, the federal funding regulations specify that "the substance of the relationship is more important than the form of the agreement." *Id.* § 200.330(c).

In short, the relationship of CCWI to the state of Maine is that of a subrecipient, not a contractor. There is no procurement relationship. CCWI determines which service providers are eligible to receive the federal funds. CCWI has its performance measured in terms of the objectives laid out in the WIOA State and Local Plans. It has responsibility for programmatic decision-making and carries out the program for a public purpose. CCWI does not provide goods or services to the state in exchange for consideration. The Defendants' claim that CCWI has a typical contract relationship with the State is undermined by the federal regulations and by WIOA itself. The previous instruments between CCWI and MDOL were called

"Subrecipient Award Agreement[s]" and explicitly refer to CCWI as the "Subrecipient." *Joint Ex.* 10.

The Court concludes that WIOA does not create a typical contractual relationship where the parties have the liberty to make any offer contingent upon any terms they might desire. An ordinary contract negotiation allows broad discretion on the offeror, but both the text of the statute and the federal regulations contemplate a relationship between CCWI and the State distinct from ordinary contract bargaining. Once all the other conditions for federal WIOA funding have been met, the state in effect becomes a pass-through of funds from the federal government to the local areas.

Since the Court concludes the Defendants do not have unlimited authority to impose conditions on the WIOA funds at the subaward stage, the Court must determine whether the sixty-percent training requirement is within the limits of the State's authority at that stage. The OMB regulations do contemplate additional conditions imposed by a state at the subaward stage, but these are limited to financial and accounting measures. *See e.g.* 2 C.F.R. § 200.331(a)(3) (required information on subaward document includes "[a]ny additional requirements that the pass-through entity imposes on the subrecipient in order for the pass-through entity to meet its own responsibility to the Federal awarding agency including identification of any required financial and performance reports"); *id.* § 200.331(a)(5) (required information on subaward document includes "[a]ppropriate terms and conditions concerning closeout of the subaward"); *id.* §§ 200.338-39 ("If a non–Federal entity fails to comply with Federal statutes, regulations or the terms and conditions of a

Federal award, the Federal awarding agency or pass-through entity may impose additional conditions" like "[requiring payments as reimbursements rather than advance payments," or requiring additional, more detailed financial reports and monitoring, or the termination of the federal award).

The Court draws two conclusions from these regulations. First, the specificity of what a state government may require of the local areas suggests what a state government may not require. In other words, there is no indication in these regulations that state governments, as pass-through entities, may impose new substantive conditions on the receipt of funds absent noncompliance with the regulations by the recipient. The state of Maine has not claimed that CCWI violated any of these regulations. Thus, there is no indication CCWI has ever failed to comply with any financial, accounting, or any other type of requirement under WIOA or the federal regulations.

To be clear, the state of Maine has the express authority under the regulations to negotiate performance conditions with the local areas. At earlier stages, the statute expressly contemplates negotiation between the Governor and the local areas, but that negotiation occurs when the state adopts a state plan, and when the local areas submit local plans for state approval. *See* 29 U.S.C. § 3141(b)(B) ("A State may identify in the State plan additional performance accountability indicators"); *Id.* §3141(c)(2) ("The local board, the chief elected official, and the Governor shall negotiate and reach agreement on local levels of performance based on the State adjusted levels of performance"); *Id.* § 3123(b)(17) ("the local plan shall include . . . a

description of the local levels of performance negotiated with the Governor and chief elected official").

At the late stage where a state passes a federal subaward through to a local area, however, the structure of WIOA eliminates the possibility of a state requiring additional performance metrics, because the Secretary must first approve any state performance requirements before the state and localities implement them. *See id.* § 3141(b)(3)(iv)(I)-(II) ("The State shall reach agreement with the Secretary . . . on levels of performance for each indicator" for each of the first two years of the state plan, and then again for any adjustments the State makes as a modification to the state plan for the third and fourth years); 20 C.F.R. § 677.165 ("States may identify additional indicators of performance for the six core programs. If a State does so, these indicators must be included in the Unified or Combined State Plan").

Since the Court concludes the text and structure of WIOA and the OMB regulations do not permit the state of Maine to impose additional performance requirements at the subaward stage, the Court must determine whether the sixty-percent training requirement is consistent with the performance requirements actually contained in the State Plan. There is no explicit percentage training requirement in the State Plan. Maine previously imposed a forty-percent training requirement but removed it from the 2016 State Plan. *See Defs.' Ex.* 6. The Defendants argue that the remaining language in the 2016 State Plan authorizes it to impose the new sixty-percent training requirement. In particular, the Defendants point to the following language in the State Plan:

> While we still feel it is important to set a goal, we now know that the specific amounts to be set may have to differ from one local area to another depending upon the differences in infrastructure costs and percentage of harder to serve customers involved . . . We now feel the best policy is to work with local areas to establish service spending goals . . . .

*Id.*

The Court cannot conclude this language authorizes the state to impose a sixty-percent training requirement at the subaward stage. The language refers to setting different levels of performance for different local areas, not another flat percentage requirement. The language refers to setting "goals" rather than another "requirement" or "condition." The new precatory language in the State Plan contemplates nonbinding targets, rather than the old mandatory forty-percent requirement. The language Defendants cite is under the heading "Policies to be rescinded." *Id.* Perhaps most importantly, it is difficult to imagine the public, the local areas, or the Secretary would have understood this language as authorizing a sixty-percent requirement when the language revoked the old forty-percent requirement. Language repealing a more lax performance requirement would not logically authorize the imposition of a more demanding one.

The Court concludes that the State Plan does not mandate the sixty-percent training requirement. The State Board's recent vote rejecting the sixty-percent spending requirement for the next round of planning further bolsters the Court's conclusion. As a result, the Defendants had no legal power under WIOA or the OMB regulations to place the sixty-percent condition upon the availability of the funds for the local areas at this stage.

Accordingly, the Court finds that CCWI is likely to prevail on the merits as to the PY17 funds, because it likely will be able to establish that the Defendants violated CCWI's right to the prompt allocation of funds, which is enforceable through § 1983.

## B.      Potential for Irreparable Harm to the Movant

CCWI has made a strong showing that it will suffer irreparable harm if the Court does not issue an injunction.   Mr. Bourret testified about CCWI's heavy reliance on the WIOA funds, which the Defendants do not deny.   WIOA funds represent seventy-five percent of CCWI's entire PY17 funding stream.   The remainder of its revenue consists of other grants which are contingent on the infrastructure and systems CCWI maintains with the WIOA funds.   As a result, without gaining access to the PY17 funds before June 2018, Mr. Bourret testified that CCWI will be required to shut down entirely at that point.   Without access to the funds, even before June, 2018, Mr. Bourret testified that CCWI will be required to curtail its activities, and he was concerned that its service provider might be required to close as early as the end of January, 2018.   Once they shut their doors, Mr. Bourret predicted that CCWI and its provider will not easily be able to reopen.

Mr. Bourret asserted that CCWI's survival as an entity depends on access to WIOA funds on the terms and in a time frame that federal law specifies and only on the conditions contained in the State and Local Plans or contemplated by federal cash management regulations.   An imminent threat to the movant's survival constitutes irreparable harm.   *See e.g. Condon v. Andino, Inc.*, 961 F. Supp. 323, 331 (D. Me. 1997) (finding irreparable harm in large part because "[a]bsent a preliminary

injunction, Plaintiff will likely be forced to terminate his residential waste hauling business"); *Warren v. City of Athens, Ohio*, 411 F.3d 697, 711 (6th Cir. 2005) (". . .the [entity] would likely go out of business. Such financial ruin qualifies as irreparable harm").

## C.  The Balance of the Relevant Impositions

The Court must balance the potential harm or burden on CCWI from withholding an injunction against the burden on the Defendants from issuing an injunction.   The Court has already discussed the implications to CCWI if its request for an injunction is denied.

Turning then to the imposition on the state of Maine, one concern that would make CCWI's claim more tenuous would be if CCWI were demanding funds from the state of Maine's fisc.  If so, its lawsuit would have Eleventh Amendment implications. The Eleventh Amendment provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. CONST. amend. XI.  In *Edelman v. Jordan*, 415 U.S. 651 (1974), the United States Supreme Court wrote that "the rule has evolved that a suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment."  *Id.* at 663.  But CCWI's lawsuit does not

demand a remedy that implicates the treasury of the state of Maine.  Here, from what

the record reveals, the funds CCWI seeks to access are federal, not state funds.[3]

In 2004, dealing with a consent decree, the Supreme Court observed:

> This case involves the intersection of two areas of federal law: the reach
> of the Eleventh Amendment and the rules governing consent degrees.
> The Eleventh Amendment confirms the sovereign status of the States
> by shielding them from suit by individuals absent their consent.  To
> ensure enforcement of federal law, however, the Eleventh Amendment
> permits suits for prospective injunctive relief against state officials
> acting in violation of federal law.  This standard allows courts to order
> prospective relief, as well as measures ancillary to appropriate
> prospective relief.

*Frew v. Hawkins*, 540 U.S. 431, 437 (2004) (internal citations omitted).  Thus, in

*Bruns v. Mayhew*, 750 F.3d 61 (1st Cir. 2014), in the context of the Medicaid program,

the First Circuit wrote that "[a] state's participation in the Medicaid program is

voluntary, but once a state chooses to participate it must comply with federal

statutory and regulatory requirements in order to receive federal matching funds."

*Id.* at 63.  Here, the state of Maine (at least for the time being) has elected to

participate in WIOA and is therefore required to "comply with federal statutory and

regulatory requirements in order to receive federal . . . funds."  *Id.*

The relief CCWI seeks is an order from a federal court to state officials

requiring them to distribute federal funds in accordance with federal rights.  Based

on the record before it, if the Court issues an injunction, there would be little, if any,

burden on the state treasury, since the federal funds pass-through the state on their

way to the local areas.

---

[3]     This conclusion is based on the record before the Court.  There is no indication in the parties'
filings that any state funds are involved in WIOA.

Accordingly, the balance of the equities tips in favor of CCWI.

**D.      The Effect of the Ruling on the Public Interest**

In the context of this case, balancing the public interest is difficult, because it requires assessing CCWI's need for the funds, the value of the tiered bureaucratic structure that WIOA imposes, the role of state government in the dispersal of federal funds, and the practical inability of state government to object on policy grounds to federal law.

On its side of the ledger, CCWI has made a convincing showing that the injunction it seeks is in the public interest.  The Defendants have not suggested that the underlying goals of WIOA are not laudable.  As noted earlier, the stated purposes of WIOA include "increas[ing] . . . access to and opportunities for the employment, education, training, and support services" and the "alignment of workforce investment, education, and economic development systems in support of a comprehensive, accessible, and high-quality workforce development system . . . ."  29 U.S.C. § 3101.  Although the Defendants are concerned about CCWI's efficiency in using the money for direct services, the Defendants do not dispute CCWI's overall allegation that it uses the approximately $3,000,000 in WIOA funds to directly or indirectly help dislocated workers, low income adults, and young adults with barriers to employment throughout the Coastal Counties Region.  *Compl.* ¶ 28.

Congress expressed its intent to give the local areas control of the funds, subject to prior negotiations with the Governor, State Board, and the Secretary at the State and Local Plan stage of the process.  There is a public interest to see that the

congressional intent is fulfilled and that the local and state actors comply with federal law.

The State Plan also suggests the injunction CCWI seeks is in the public interest. The State Plan is the end result of a public process of meetings, planning, and approvals among citizens, the local areas, the State Board, the Governor, and the Secretary. The State Plan indicated that the previous forty-percent training requirement "negatively impacted staff-assisted services" in some of the local areas. *Defs.' Ex.* 6 *State of Maine 2016-2020 Unified Plan*, at 2. It also said, "Most importantly when we reviewed the percentage of participants enrolled in formal training before imposing the spending requirement and numbers didn't change, regardless of the amount spent . . . We did find that the cost per participant went up significantly with the requirement."

As a result of these concerns, the current State Plan repealed the previous forty-percent training requirement and the State Board recently voted not to include the sixty-percent requirement in the next State Plan. CCWI posits that there is a public interest to vindicate the process WIOA outlines for setting performance measures, and to uphold the negotiated choices that all the relevant actors made during the last two successive planning stages.

In response, however, the Defendants—just as CCWI—justify their position on the basis of an overriding public interest. This decision has described the tiered, highly bureaucratic system under WIOA for the distribution of federal job training funds. As Mr. Bourret conceded, CCWI does not itself provide any direct services to

job seekers. Instead, it contracts with Goodwill Industries of Northern New England through Workforce Solutions, the service provider, which in turn provides direct services.

Furthermore, Mr. Bourret testified that state government has no direct control over CCWI's budget. Instead, CCWI's local board controls its budget. Mr. Bourret testified that the local board consists of 51% local employers as well as representatives of adult education, the community college system, the Job Corps, and the AFL-CIO. It also has what is termed a Chief Elected Official (CEO), in this case an elected County Commissioner, as a member of the Board.

As noted, WIOA also creates a state board, the SWDB. The SWDB is free to agree or disagree with the state's governor. Thus, on December 1, 2017, according to Mr. Bourret and Commissioner Crosby, the SWDB voted to reject MDOL's request that it commit to spending at least 60% of its budget to direct training as opposed to administrative costs, such as salaries, and infrastructure, such as leases.

This layered approach to job training comes at a cost. Although Mr. Bourret certainly believes that CCWI's oversight function adds value to WIOA's job training program, he conceded that he draws an annual salary of $97,000 and receives benefits equaling an additional $27,000 for an annual total of $124,000. If his salary package is duplicated in the other two regional local area organizations, the chief administrators receive $372,000 in salaries, which under a less bureaucratic system could directly assist people seeking work.

One reflection of the possible inefficiency of multiple local areas is the relatively small percentage of WIOA funds actually spent on direct training. Mr. Bourret testified that in general one-third of CCWI's budget is spent on staff, one-third on infrastructure, and one-third on direct training. As noted earlier, the 2012 State Plan called for 40% of the funds to be spent on direct training. *Pl.'s Ex.* 12 *Workforce Investment Act, Strategic Plan 2012-2016*, at 8 ("The goal is to move the Training Expenditure statewide average up to 30% in PY13 and then to 40% by PY14. In PY 14 each LWIB [Local Workforce Investment Board] will be asked to meet or exceed the 40% goal"). Mr. Bourret testified that the 2012-2016 State Plan put pressure on the local boards to reach this goal, and although CCWI was concerned about whether it could meet the goal and objected to the 40% provision, it was overruled. In the end, Mr. Bourret stated that CCWI's budget dedicated 38% to direct training.

During his testimony, Mr. Bourret discussed the fact that the 40% direct training requirement did not survive into the 2016 State Plan, and that the current State Plan contains no specific requirement as to the percentage of the local areas' budgets that must go to direct training. Even though the 2016 version of the State Plan sought to justify the elimination of even the 40% goal for direct services, Governor LePage is apparently not convinced and maintains the view that the local areas, including CCWI, should spend a higher percentage of their funds for direct services. The Governor's concerns have been met with resistance from the local boards, particularly from CCWI.

On its face, a job training organization that spends only about 30% of job training funds on actual job training is not a model of efficiency, especially since the organization has purely an oversight function, does no direct job training, and contracts out what Mr. Bourret described as the "boots on the ground" work to a service provider. Mr. Bourret testified that CCWI receives approximately $3,000,000 in WIOA funds and, using the 30% figure, only about $900,000 of that money goes to direct services with about $2,100,000 going to salaries and infrastructure.

One can sympathize with the Defendants' view that there must be a more efficient way to get training funds to the people in need. CCWI properly stressed the dire consequences flowing from the Governor's withholding training funds. At the same time, it may be a fair point that WIOA's structure weaves into the provision of training services unusually high administrative and infrastructure costs, annually diverting millions of dollars that could be used to assist people. On these policy issues, both CCWI and the Defendants make legitimate points.

Even though CCWI emphasized the tripartite structure of WIOA, consisting of the federal government, the state government, and the local area organizations, the plain fact is that under CCWI's view of WIOA, state government is by far the weakest among the three. The Court already mentioned the SWDB's vote to reject the Governor's demand that the local areas spend 60% of WIOA funds on direct services. In addition, when Governor LePage sought to meet with CCWI's board on September 26, 2017, Charles Crosby, the President of the CCWI Board and a County Commissioner for Sagadahoc County, testified that he refused to attend the meeting

unless it was publicly noticed and unless CCWI staff were allowed to attend.[4]  In fact, Commissioner Crosby did not attend the scheduled meeting with the Governor.

Theoretically, the Governor has some influence over the contents of the State Plan, which must be resubmitted every four years to the United States Secretary of Labor for approval.  29 U.S.C. § 3112(a), (c).  But WIOA and its regulations contain mandates about the development of the State Plan, which entities must be allowed to participate, and the process that the state of Maine must follow in developing its quadrennial version of the State Plan.  20 C.F.R. § 676.105(d)(1)-(3)(i)-(vi).  For example, federal regulations require "an opportunity for public comment on and input into the development of the Unified State Plan prior to its submission."  20 C.F.R. § 676.130(d).  The regulations specify exactly who must be allowed to comment:

> The opportunity for public comment must include an opportunity for comment by representatives of Local WDBs and chief elected officials, businesses, representatives of labor organizations, community-based organizations, adult education providers, institutions of higher education, other stakeholders with an interest in the services provided by the six core programs, and the general public, including individuals with disabilities.

20 C.F.R. § 676.130(d)(1).

As outlined above, WIOA gives state government a number of roles in its implementation, including audit and compliance functions, decertification authority, and the ability to negotiate standards, and influence the contents of the State Plan.

---

[4]      The Court takes no position on whether Commissioner Crosby is correct in his interpretation of Maine's Freedom of Access Act, 1 M.R.S. §§ 401 *et seq*.  The Court views Commissioner Crosby's refusal to meet with the sitting Maine Governor to discuss the Governor's concerns about CCWI's use of public money as a direct reflection of the relative lack of power residing with state government under WIOA.

But none of the contemplated powers of state government under WIOA gives state government the authority to effect a significant policy change in WIOA itself. Thus, not surprisingly, the federal government retains federal authority over a federal law it funds with federal money.

The same unequal authority under WIOA characterizes the state government's relationship with the federal government. Mr. Bourret stated that in 2012, the Maine State Plan originally called for the elimination of local boards, but the United States Department of Labor rejected Maine's proposal and told the state of Maine that it had to deal with the local boards. On July 17, 2017, Governor LePage wrote United States Secretary of Labor R. Alexander Acosta, requesting that Maine be granted "single State local area designation" under WIOA. *Joint Ex.* 1 *Letter from Governor Paul R. LePage to The Hon. R. Alexander Acosta, Sec. of Labor* (Jul 11, 2017). On August 30, 2017, Deputy Secretary Byron Zuidema responded to Governor LePage, rejecting his request:

> Unfortunately, we are unable to approve your request. WIOA Sec. 189(j)(3)(A)(i) explicitly prohibits the Secretary from waiving any statutory or regulatory requirements relating to the establishment and function of local areas and/or allocation of funds to local areas. Additionally, 20 CFR [§] 679.270(a) provides that only "[the] Governor of any State that was a single-State local area under the WIA as in effect on July 1, 2013 may designate the State as a single-State local area under the WIA as in effect on July 1, 2013 may designate the State as a single-State local area under the WIOA." There are currently no statutory or regulatory procedures for a State with multiple local workforce development areas to become a single-area State.

*Joint Ex.* 2 *Letter from Deputy Assistant Sec. Byron Zuidema to The Hon. Paul R. LePage* (Aug. 30, 2017). The record therefore reveals that under current state of things, the governor and state government are virtually impotent in their ability to

influence significant policy changes with either the federal government or the local areas under WIOA.[5]

In describing the policy interests involved here, the Court is not called on to judge and does not decide who is right. The money is, after all, federal money, and if Congress wishes to make a layered bureaucracy the price of the receipt of training funds, it has the legal right to do so. It may be that WIOA's current scheme is a better way to obtain the benefit of local control, and to respond to the idiosyncrasies of local labor markets while at the same time balancing the need for national uniformity under a federal statute, and infusing a very modest degree of control from state government. It may be that Governor LePage's preference for lower administrative costs and a higher percentage of direct services to people in need would be a more effective way to deliver more services to the people WIOA was enacted to assist.

The Court cannot and does not resolve this policy debate. CCWI sees its administrative oversight function as a local area as valuable and essential to the proper delivery of WIOA services to people in need of training services; the Governor sees CCWI as a wasteful and inefficient bureaucratic intermediary between the federal and state governments and the people in need of training services; the Court sees their policy dispute as in equipoise.

---

[5]     Two of the other local area organizations compromised with the Governor and accepted his demand that 60% of their budget go directly to customer services. However, their acquiescence was before the issuance of this Order, which confirms greater legal authority in the local area organizations than they might have surmised.

### E.    The Statute, Timing and the Moral High Ground

The Court concludes that three of the factors weigh in favor of issuing the injunction and the last is evenly balanced.  The Court ends with a few points.  The statute demands the relief CCWI is requesting.  The statutory language is mandatory and clear: the funds a governor is required to allot to the local area "shall be made available . . . for a local area not later than 30 days after the date the funds are made available" to the governor "or 7 days after the date the local plan for the area is approved, whichever is later."  29 U.S.C. § 3242(e).  Once the process reaches the point where the federal government is ready to transfer WIOA funds to the state, the state operates merely as a pass-through and must, as the statute says, make those funds available to the local area "not later than 30 days after the date the funds are made available to the Governor . . . ."

Another issue is timing.  To the extent the Governor has the ability to effect a significant change in the way the local areas in Maine operate under WIOA, his efforts at reform cannot be at the moment the funds are to be released.

Thirdly, the Court does not perceive either CCWI or the state officials as occupying a higher moral ground in this case.  CCWI, in particular, occasionally allowed a degree of rhetorical smugness to creep into its argument, painting itself as championing the best interests of its customers against the unreasoned objections of state government.  To be clear, the Court is agnostic as to whether the current WIOA model is a better approach or whether a more flexible, centralized model would result in more money being spent for people in need of training.  The Court does not blame

CCWI for filing this lawsuit to obtain its allocated WIOA funding nor does it blame Governor Paul LePage and Commissioner John Butera for seeking to make CCWI and the other local areas more accountable, efficient and effective.

In addition, cognizant of the importance of judicial restraint, the Court is extremely reluctant to enjoin the duly elected Governor and a duly appointed State Commissioner to act, when they have chosen not to do so. The Court is conscious that its injunction runs not only against a co-equal branch of government but against a separate sovereign. The Court is exercising its authority to mandate state compliance with a federal statute because in this case the statute clearly demands it and the required action is confined and readily achievable.

Finally, although it is clear that an injunction should issue, the Court is not clear what language would be appropriate for the injunction. This is because of the rather arcane way the WIOA funds are transferred from Washington, D.C. through Augusta, Maine to Brunswick, Maine, and the Court's uncertainty about when the funds are to be transferred. Mr. Bourret explained a rather complicated process by which the WIOA funds are made available, and counsel for CCWI echoed the complexity in his closing remarks. It is the Court's intention to order the Defendants to make the PY17 funds available to CCWI in the ordinary course. It may be that a simple order, requiring the Defendants to release the funds would be appropriate, but a simple order may be too simple, and would require the Defendants to release funds before they would ordinarily be released. The Court will give the attorneys for both CCWI and the Defendants seven days from the date of this opinion to consult and

propose to the Court acceptable language to be contained in the injunction. If the parties are unable to agree on proper language, the Court will resolve their disagreement.

## V. FINAL INJUNCTION

Prompted by CCWI's urgent requests for relief and dire predictions of serious consequences, the Court has driven this case through the system with unusual speed without the standard discovery period. Counsel cooperated and supplied some discovery to the opposing party/parties. However, during the December 18, 2017 hearing, the Court discussed with the parties, the Defendants in particular, what additional discovery they would need in order to fully litigate this case to a permanent injunction and to allow for appeal. The Court charged counsel, especially counsel for the Defendants, with considering what additional discovery was truly necessary after the issuance of this order. To give counsel an opportunity to digest this opinion and to propose what should happen next, the Court will grant the parties' counsel the same seven days from the date of this decision to notify the Court as to next steps.

## VI. CONCLUSION

The Court DENIES Defendants Paul R. LePage and John Butera's Motion to Dismiss (ECF No. 17). The Court DENIES in part and GRANTS in part Plaintiff Coastal Counties Workforce, Inc.'s Motion for a Preliminary Injunction (ECF No. 16). The Court DISMISSES without prejudice so much of Coastal Counties Workforce, Inc.'s motion for preliminary injunction as applies to PY16 funds. The Court GRANTS Coastal Counties Workforce, Inc.'s motion for preliminary injunction as it

applies to PY17 funds. The Court DEFERS issuance of the injunction on the PY17 funds in order to give counsel an opportunity to consult and propose specific language.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 3rd day of January, 2018